## HAXTUN and others *vs.* CORSE and others.

A trust, created by will, to invest the capital of a fourth part of the residuary estate of a testator, and to apply the income, or so much as may be necessary, to the support of B. C.'s family, and the education of his children, is such an express trust as is authorized by the 3d subdivision of the 55th section of the article of the revised statutes relative to uses and trusts. For it is a trust to receive the income of the property and apply so much of it as is necessary, to the support of such of the members of B. C.'s family as were in existence at the death of the testator, during the life of B. C., or for a shorter period if he should die before them; and subject to open and let others into the class to be supported from time to time.

But an implied trust to accumulate a part of the income, of a share of the testator's estate, for children or descendants of B. C. who are not in existence at the time when such accumulation is to commence, or whose right to the accumulated fund is entirely contingent, is void, under the provisions of the revised statutes relative to accumulations. And the surplus income of the trust property, so far as it arises from real estate, or the proceeds thereof, if it is not otherwise disposed of by the will of the testator, belongs to his heirs at law; and so far as it arises from the personal estate, it belongs to his widow and next of kin.

Where a power in trust, to executors, to lease the real estate of the testator until it can be sold, would have the effect to suspend the absolute power of alienation in such real estate beyond the time allowed by law, it is void. But the power in trust to sell, in such a case, will still be valid. And the real estate, in equity, will be considered as converted into personalty immediately; where such a conversion is necessary to carry into effect the will of the testator, and to prevent injustice to any of the objects of his intended bounty.

Haxtun *v.* Corse.

Where a will contains different trusts, some of which are valid, and others void, or unauthorized by law; or where there are distinct and independent provisions as to different portions of the testator's property, or different estates or interests in the same portions of the property are created—some of which provisions, estates, or interests, are valid, and others are invalid—the valid trusts, provisions, estates or interests, created by the will of the testator, will be preserved; unless those which are valid and those which are invalid are so dependent upon each other that they cannot be separated without defeating the general intent of the testator.

Accumulations of the income of real estate for the benefit of infants, who are in esse at the time such accumulations are directed to commence, and which accumulations must terminate with the minorities of the respective legatees, are valid.

To deprive an heir at law, or a distributee, of what comes to him by operation of law, as property not effectually disposed of by will, it is not sufficient that the testator in his will, has signified his intention that such heir, or distributee, shall not inherit any part of his estate. But to deprive such heir, or distributee, of his share of the property, which the law gives him in case of intestacy, the testator must make a valid and effectual disposition thereof to some other person.

A judgment creditor, by coming in and proving his judgment, as a debt, under proceedings in bankruptcy against his debtor, precludes himself from proceeding farther in a creditor's suit against the debtor, or against his estate which has been acquired subsequent to the decree in bankruptcy; although such proceedings in bankruptcy do not result in the discharge of the debtor.

Notwithstanding the general language contained in the 5th section of the bankrupt act, congress did not intend that the proving of debts, by creditors, under the proceedings in bankruptcy, should be an absolute abandonment of all claim against the future acquisitions of their debtor, where his discharge is refused, or where it is void for any of the frauds specified in the act; but merely that the proving of debts under the decree should be considered as a waiver of the right of the creditors to institute any suits or proceedings, either at law or equity, which are in any way inconsistent with the election of such creditors to obtain satisfaction of their debts out of the property of the bankrupt, under the decree; and a consent to be bound by the discharge, in case the bankrupt should obtain one which was not impeachable for fraud or wilful concealment of his property.

This construction of the bankrupt act will protect the bankrupt from any proceedings against him, either at law or in equity, until it shall be finally settled that he is not entitled to a discharge. And where a discharge is granted, it will likewise protect him against the claims of fiduciary creditors, who have come in and proved their debts under the decree in bankruptcy.

And *it seems* that a proper construction of the bankrupt act will prevent foreign creditors, who have come in and proved their debts under the proceedings in bankruptcy, from instituting suits in another country against a discharged bankrupt: if his discharge was not obtained fraudulently.

But it will not deprive creditors who have come in and proved their debts, and who have successfully resisted the discharge of the fraudulent bankrupt, of all claim to his future acquisitions. Nor will it deprive them of the right, which is given under the 4th section of the act, to impeach the discharge for fraud or wilful con

cealment of property, where such fraud is discovered after the discharge has been obtained; if the creditors have not litigated the question of fraud, upon the proceedings in bankruptcy, so as to be estopped, by the decision of the court or jury, from setting up the same matter again.

Where a creditor's bill against a bankrupt, founded upon a judgment recovered previous to the decree in bankruptcy, was filed subsequent to such decree, and before the creditor came in and proved his debt under the proceedings in bankruptcy, and where, at the time such debt was proved, the application for the discharge of the bankrupt was still pending and undetermined; *Held* that it would be inconsistent with the intent and meaning of the 5th section of the bankrupt act, for the complainant to retain the lien he had acquired upon the property of the bankrupt, by the filing of his creditor's bill; so as to enable him to prosecute that suit to effect if the discharge should be subsequently denied.

The 5th section of the bankrupt act does not merely suspend suits, commenced against the bankrupt, in the situation in which they are at the time the creditors come in and prove their debts under the proceedings in bankruptcy; but all proceedings which have been commenced previous to that time are absolutely relinquished, surrendered, and discontinued, by the mere act of proving the debt for *the recovery of which such proceedings were instituted.*

The decision of the district court of the United States for the southern district of New-York, in the *Matter of King,* (5 *Law Rep.* 320,) that creditors could not file objections and contest the bankrupt's right to a discharge, without having come in and proved their debts under the decree in bankruptcy, questioned, and its correctness doubted.

Under the English bankrupt laws, all the future acquisitions of the bankrupt, down to the time of the obtaining of his certificate, or discharge, belong to his assignees; for the benefit of his creditors who have come in under the commission and proved their debts, until such creditors are fully paid. But under the late United States bankrupt law, the assignee is only entitled to property which the bankrupt owned, or had an interest in, at the time of the decree declaring him a bankrupt; although such bankrupt fails to obtain a discharge.

THIS was an appeal from a decree of the vice chancellor of the first circuit, allowing the several demurrers, of the defendant Barney Corse, and of the executors of the will of his father, Joseph Corse, to the supplemental bill of the complainants; and dismissing such supplemental bill, with costs.

The complainants were judgment creditors of Barney Corse, previous to the presentment of his petition in bankruptcy; and executions had been issued upon their respective judgments, and returned unsatisfied, before that time. On the third of February, 1842, the judgment debtor presented his petition in bankruptcy to the district court for the southern district of New-

York.    **And** on the 4th of March, thereafter, he was duly declared and decreed to be a bankrupt; and his property was vested in the assignee in bankruptcy.    On the 16th of the same month, the bankrupt applied for his discharge; and the court made an order for his creditors, and other persons interested, to show cause on the 19th of June thereafter, why he should not have a discharge from his debts.    The proceedings in bankruptcy were in that situation at the time of the filing of the original bill of the complainants in this suit.    After the decree in bankruptcy, and before the filing of such original bill, Israel Corse, the father of the bankrupt, died; leaving a widow and four children, his only heirs at law and next of kin.

The decedent, by his will, gave to his widow a specific and a pecuniary legacy, in lieu of her dower, and gave several life annuities, to collateral relatives, without charging them upon his real estate.    His son Barney Corse, and one of his daughters, were married; and each of them had five children in esse at the time of the death of the testator.    His other two children, a son and a daughter, were then minors and unmarried.    And the decedent, by his will, disposed of his residuary real and personal estate as follows:

"I order and direct that one equal fourth part thereof, or the avails thereof, be placed at interest, and the interest or income thereof, during the life of my son Barney Corse, to be applied, at the discretion of my acting executors for the time being, towards the support of his family, and the education of his children, born and to be born; and that the principal of the said one-fourth, and what may remain of the interest or income thereof, be distributed and divided, as soon after his decease as can conveniently be done, unto and among the then living children of my said son Barney Corse, and the issue of such of them, if any, as shall then have deceased leaving lawful issue then living; each child of his then living taking one equal share thereof, and the issue of such of them as shall have then deceased leaving lawful issue then living, if one, solely, if more than one, jointly and equally; taking by representation the

share or shares which his, her, or their parent or parents would have taken if living.

"One other equal fourth part of my said residuary estate, or of the avails thereof, is to be disposed of as follows : the sum of $20,000, part thereof, is to be invested or placed at interest, the interest or income thereof to be paid annually, or oftener, as the same shall be received, during the life of my daughter Lydia Ann Thorne, wife of Jonathan Thorne, for her separate use and benefit, free from the debts of her present or any future husband ; the principal so to be invested or placed at interest, to be distributed and divided as soon after her decease as can conveniently be done, unto and among the then living children of my said daughter, and the issue of such of them as shall then have deceased leaving lawful issue then living ; each child of hers then living, taking one equal share thereof, and the issue of such of them as shall then have deceased leaving lawful issue then living, if one, solely, if more than one, jointly and equally, taking by representation the share or shares thereof which his, her, or their parent or parents would have taken if living. And the surplus of the said last mentioned one-fourth part of my residuary estate, over and above the said sum of $20,000, is to be paid and delivered over to my said daughter, her executors, administrators and assigns, to and for her and their own proper use and benefit."

He gave one other fourth to his daughter Mary Corse and her issue, in nearly the same words ; except that the surplus beyond the $20,000, which was limited over to her issue, was not directed to be paid to her immediately, but when she should arrive at the age of twenty-one, or to her executors, administrators or assigns. And the remaining one-fourth of his residuary estate he gave to his son Israel Corse and his issue, in the same manner, substantially ; except as to the income of the $20,000 of that share, which was to be invested during his life. That income was, by the terms of the will, to be paid to the testator's son Israel annually, or oftener, as received, during his natural life, for his use and benefit ; or otherwise, *in the discretion of the executors*, to be used and applied in whole or in part, for

his use and benefit, and for the use and benefit of such family as he might thereafter have, and in such way and manner as the executors should deem most beneficial. And such part thereof as should remain undisposed of at his death, was to be distributed in the same manner as the capital out of which it arose was directed to be distributed and disposed of.

The will also directed that the testator's two minor children should be educated and supported out of their respective shares of his residuary estate until they severally should arrive at the age of twenty-one. And it contained a further provision that if either of the testator's children should die without leaving lawful issue then living, so that the principal of the investments, or any of them, should not vest in the issue, the principal which should not so vest should go to the testator's then heirs, in such shares and proportions as by the present law of this state they would take in real estate of which the testator might have died seised. This clause of the will, however, was altered by a codicil, which declared that it was the testator's intention that his son Barney Corse should in no event become entitled to any part of his estate, and by which the testator directed that all interest or benefit which his said son could in any event become entitled to, under that clause of the will, should become vested in the children of his said son who should be living at the time of the happening of the contingency, contemplated in such clause. The original will appointed the executors to be the testamentary guardians of the persons and estates of the testator's two minor children; and authorized them, or such of them as should assume the burthen of the execution of the will, or the survivor of them, to sell his real estate; and until such sale, to rent or lease the same.

The codicil gave a life estate to the widow in one of the testator's houses and lots in the city of New-York, and made some changes in respect to the executors. It also made some other devises and bequests, which it is unnecessary to state, as they cannot affect any disposition, made by the will, of the testator's residuary estate.

In April, 1842, the will and codicil were proved before the surrogate, and letters testamentary thereon were issued to the

Haxtun *v.* Corse.

defendants R. C. Cornell, S. Willets, and J. Thorne, as executors. And on the 11th of June, in the same year, the complainants filed their original bill in this cause against Barney Corse, their judgment debtor, and his children, his brother and sisters, and the children of Mrs. Thorne, together with the executors of the will of Israel Corse, deceased; for the purpose of reaching some supposed interest which Barney Corse had under the will of his father. The bill was in the usual form of creditor's bills, setting forth the recovery of the judgments and the return of the executions unsatisfied; and stating that the judgment debtor had equitable interests, things in action, or other property, of the value of $100 or more, exclusive of all prior just claims thereon. The bill also stated the death of Israel Corse, the elder, and the making of the will and codicil, the taking out of letters testamentary thereon, and the facts above set forth, as to the situation of his family, &c. and that, at the time of his death, the testator owned real and personal estate to a large amount, and that one-fourth of his residuary estate was worth upwards of $70,000. The complainants thereupon insisted that the trusts of the will were void as respected the share of Barney Corse, or of his family therein, and that he was entitled to one-fourth of the entire residuary estate of his father. The bill also set out the proceedings in bankruptcy, as far as they had progressed at the filing of such bill, and stated that the bankrupt had not yet received his final discharge and certificate; so that the property received from his father was in no way affected by the proceedings in bankruptcy, but still remained liable to the claim of the complainants. And, in addition to the usual prayer in a creditor's bill, the complainants prayed that the will of Israel Corse the elder might be declared void, so far as the devise of the one-fourth part of the residuary estate to the family of Barney Corse was concerned, and that the same might be decreed to belong absolutely to their judgment debtor; and that the executors might be decreed to pay and apply that part of the estate of the testator to the payment and satisfaction of the judgments of the complainants.

To this bill Barney Corse appeared, and put in a plea stating the presenting of his petition in bankruptcy, in the form required by the statute, and the decree declaring him a bankrupt; and that in July, 1842, which was after the commencement of this suit, the complainants appeared in the district court, as creditors of the bankrupt, and proved their several debts against him, set out in their bill in this suit, in the manner prescribed in the bankrupt act. The executors, and Mrs. Thorne and her husband, appeared and answered the bill; setting up the same defence in their answers. The other defendants also appeared and answered, by their guardians ad litem; and replications were afterwards filed to the plea and answers.

In March, 1843, the complainants filed their supplemental bill, stating the filing of their original bill, and the proceedings thereon, and that before any further proceedings were had upon such original bill, the defendant Barney Corse, in September, 1842, elected, in the matter of his application for a discharge under the bankrupt act, to go to a jury upon an issue directed by the district court, pursuant to the provisions of the bankrupt act; that the issue to be tried by such jury was whether the bankrupt had admitted into his schedule a false and fictitious debt; that the jury, in January, 1843, found a verdict against the bankrupt and in favor of the affirmative of that issue; and that on the 21st of the same month, the district court made a final order, upon the verdict, that the discharge of the bankrupt be denied him. The complainants further stated, in their supplemental bill, that they proved their debts, upon which the original bill was founded, under the proceedings in bankruptcy, but that such proofs were not made for the purpose of claiming or receiving any dividends but solely with a view to oppose and defeat the final discharge of the bankrupt; which by the bankrupt act they could not do without proving their debts.

To the supplemental bill the defendant Barney Corse, and the executors, severally, put in general demurrers. And the vice chancellor, without examining the question whether the bankrupt took any interest in the estate of his father, decided

Haxtun v. Corse.

that the decree in bankruptcy vested all the property of Barney Corse in the assignee in bankruptcy; that by the bankrupt act creditors were not bound to prove their claims to entitle them to come in and oppose the bankrupt's discharge; that they could not come in and prove their debts conditionally and that having proved such debts in the proceedings in bankruptcy, they were precluded, by the 5th section of the bankrupt act, from maintaining any suit at law or in equity for the recovery thereof; and that such proof was a surrender of their judgments, although they succeeded in defeating the discharge of the bankrupt. From the decision and decree made upon the demurrers the complainants appealed to the chancellor.

*T. Sedgwick*, for the appellants. The complainants having proved their debts, not for the purpose of obtaining a dividend but solely to prevent the bankrupt's discharge, and having effected that object, are not to be in any way prejudiced or affected by it. Any other construction of the statute would involve very injurious and inequitable results. The sole object of the statute is to secure equality among creditors.

*M. T. Reynolds*, for the respondents. The demurrer is to a supplemental bill, setting up new matter as reviving a lien, which was decided, upon the argument of the plea to the original bill, to have been surrendered. A right of action once waived or surrendered is gone forever. A judgment surrendered is no longer in existence. (*Thomas* v. *Thompson*, 2 *John.* 471.) The plaintiffs, by proving their debts, surrendered, that is, released, their judgment. The language of the act of congress is explicit on this point, and is free from ambiguity or obscurity. This provision is unconditional in its terms, and is not qualified by any thing in other parts of the act. The failure of the bankrupt to obtain his discharge was a contingency contemplated and expressly noticed in the act. Congress has provided for it as far as it has thought fit, and has not provided that it shall operate as a waiver of the surrender, or as a revival of the judgment. This is conclusive. The surrender of the judgment takes place as

soon as the creditor proves his debt. The effect is immediate and irrevocable; the judgment is thereby surrendered; that is, ipso facto it ceases to exist. (2 *Taunt.* 246. 18 *Ves.* 290. 1 *Rose's Rep.* 394. *Buck,* 423. 5 *Law Rep.* 165, 227, 228.) A creditor cannot even prove conditionally or for the mere purpose of opposing the discharge, and with a reservation of his right to resort again to his judgment. (5 *Law Reporter,* 447.) Proving his debt is attended with the immediate, final, and conclusive effect of a surrender and release of the judgment. The words of the act being plain and peremptory, must be obeyed; although no reason could be suggested for the provision. But there is an obvious reason for not allowing the creditor to come in and share in the assets, and yet hold the lien upon the bankrupt's property acquired by his judgment. The decree in bankruptcy is in the nature of a statute judgment and execution, of which the creditor avails himself by proving his debt. It is right, therefore, that he should release his separate judgment, so that property bound by it, or which has been seized under an execution in his favor, shall pass into the hands of the assignees for the benefit of all the creditors.

Judgment debts, and debts not in judgment, are put upon the same footing, as respects the effect of proving them. All debts that are proved are thereby discharged; that is, all rights of action are gone; and the creditor has merely a right against the fund in the hands of the assignee. Debts not proved are not discharged unless the bankrupt obtains his certificate. This distinction would be nullified if the appellant's construction should be maintained. The clause respecting the proof of debts was probably borrowed from the English bankrupt acts, where a clause substantially similar has been held to operate ipso facto as an irrevocable surrender of the debt. At all events, the proof of the debt is a complete surrender of the judgment until the court of bankruptcy allows the proof to be withdrawn. While the proof continues in force, the judgment is virtually surrendered.

THE CHANCELLOR. The vice chancellor, from what is stated in his opinion, appears to have overlooked the fact that

Israel Corse the elder died after the decree in bankruptcy. He therefore did not examine the question whether the judgment debtor had any interest in the residuary estate of his father, either under the will of the latter, or otherwise. That point is not material so far as relates to the judgment debtor himself. For there is a distinct averment in the bill that he has property to the amount of $100 or more, independent of the claim which the complainants make to one-fourth of the residuary estate of his father. And as he has no title to any property which belonged to him at the time of the decree in bankruptcy, this averment can only be supported by supposing that he has acquired some property since that decree. But so far as the executors are concerned, neither the original nor the supplemental bill can be sustained, against them, unless it appears from the facts stated therein that the judgment debtor has some interest in the estate of his father. For, if he has not, the executors were improperly made defendants; and their demurrer must be sustained; whatever view may be taken of the other questions in the cause.

I have not been furnished with the reasons of the complainants' counsel for supposing that the devise and bequest of one-fourth of the residuary estate of the testator, for the support of the family of Barney Corse during his life, with remainder in fee to his children or issue, is void. And I have looked in vain for any thing to satisfy me that it is so in fact. It does not appear whether Barney Corse had a wife living, but the testator undoubtedly contemplated that he might have one; for he speaks of his son's children, born and to be born. The support of the wife, as well as the children of the son, was therefore probably intended to be covered by the word family in the original will; although in the codicil the testator speaks of this one-fourth of his residuary estate which he had by his will directed to be invested and placed at interest during the life of Barney Corse, and the interest or income, to be applied by the executors, in their discretion, to the support of his children. It is perfectly clear that he did not intend to provide for the support of Barney Corse himself out of that share of the prop-

erty. For, in the codicil, he says it is his will and intention that his son Barney shall in no event become entitled to any part of his estate.

A trust in the executors, as to this part of the residuary estate, is not created in terms. But, taking the whole will together it is very evident that he intended his executors should invest one-fourth of the residuary personal estate, and one-fourth of the proceeds of the real estate which they were to sell for the purposes of the will, and hold the same as executors during the life of Barney Corse; and should accumulate the interest or income which they should not think it necessary to expend for the support of the family in the meantime. And the testator intended that after the death of Barney Corse, the principal of that fourth of the estate, together with the accumulations thereon, should go to his children then living, and to the issue of those who had died, per stirpes. So far as regards the trust to invest the capital of this fourth of the residuary estate, and to apply the income, or so much as may be necessary, to the support of Barney Corse's family and the education of his children, it appears to be such a trust as is authorized by the 3d subdivision of the 55th section of the article of the revised statutes relative to uses and trusts. (1 *R. S.* 728.) For it is a trust to receive the income of the property, and to apply so much of it as is necessary to the support of such of the members of Barney Corse's family as were in existence at the death of the testator, for life, or for a shorter period if Barney Corse should die before them; and subject to open and let others into the class, from time to time. It is true, such an interest, in the income of the estate, may suspend the absolute ownership of the property, during its continuance. But as that absolute ownership is in no event to be suspended beyond the life of Barney Corse, which is only during the continuance of one life in being at the death of the testator, this portion of the will does not contravene the provisions of the revised statutes in that respect. And, for the same reason, the contingent limitations over of the capital of this fourth part of the testator's estate, in fee, upon the death of Barney Corse, are valid.

Haxtun v. Corse.

The implied trust, however, to accumulate any part of the income of this share of the testator's estate, for children or descendants of Barney Corse who were not in existence at the time when such accumulation was to commence, or whose right to the accumulated fund is entirely contingent, is undoubtedly void under the provisions of the revised statutes relative to accumulations. (1 R. S. 726, §§ 37, 38. *Idem*, 773, §§ 3, 4.) And such surplus income, so far as it arises from real estate or the proceeds thereof, if it was not otherwise disposed of by the will of the testator, would belong to his heirs at law; and so far as it arises from the personal estate, would belong to his widow and next of kin.

I am inclined to think, however, that for the present, the whole of this surplus income is validly and effectually disposed of by the will; although in the event of some contingencies, which may happen, certain future interests in the income of this share of the testator's estate, which are attempted to be created by the will, during the life of Barney Corse, may not be valid under other provisions of the statutes. The 40th section of the article of the revised statutes relative to the creation and division of estates, (1 R. S. 726,) provides that when, in consequence of a valid limitation of an expectant estate, there shall be a suspense of the power of alienation, or of the ownership, during the continuance of such suspense the rents and profits of the property are undisposed of, and no valid direction for their accumulation is given, such rents and profits shall belong to the persons presumptively entitled to the next eventual estate. And this rule also applies to a future interest in personal estate, by another section of the revised statutes. (1 R. S. 773, § 2.) In the case under consideration, the five children of Barney Corse who were in esse at the death of the testator, are presumptively entitled to the next eventual estate in this fourth part of his property. And I see nothing to prevent them from taking the whole of the income thereof, which is not effectually disposed of by the will, during the time they continue to be thus presumptively entitled. Nor do I see any difficulty in permitting after-born children to come in and share in the income which

may accrue after they become presumptively entitled to a share of the next eventual estate in the capital of the fund or property out of which such income is to arise.

If the authority given to the executors, to lease the real estate until it can be sold, has the effect to suspend the absolute power of alienation, in that part of the testator's property, beyond the time allowed by law, it is void. But the power in trust to sell would still be valid; and the real property must, in equity, be considered as converted immediately into personalty, where it is necessary to carry into effect the will of the testator, and to prevent injustice to any of the objects of his intended bounty. (*Van Vechten* v. *Van Vechten*, 8 *Paige's Rep.* 104.) For, where a will contains different trusts, some of which are valid and others void, or unauthorized by law, or where there are distinct and independent provisions as to different portions of the testator's property, or where different estates or interests in the same portions of the property are created, some of which provisions, estates or interests, are valid, and others invalid, the valid trusts, provisions, estates or interests, created by the will of the testator will be preserved; unless the valid and the invalid are so dependent upon each other that they cannot be separated without defeating the general intent of the testator. (*Darling* v. *Rogers & Sagory*, 22 *Wend. Rep.* 483. *Parks* v. *Parks*, 9 *Paige's Rep.* 117.)

There is also a void trust, for the accumulation of so much of the income of $20,000 of Israel Corse junior's fourth of the residuary estate as the executors in their discretion shall not think proper to pay over to him, or apply to his support or that of his family, if he should have one. That portion of the income, however, is not undisposed of by the will; although Israel junior had no children at the death of the testator. For by the provisions of the will and codicil, his two sisters, and the children of his brother Barney who were then in esse, were presumptively entitled to the next eventual estate in that part of the testator's property; and they are entitled to so much of the income as is not validly and effectually disposed of in some other way. But if Israel should marry and have issue, such issue would then

Haxtun *v.* Corse.

be presumptively entitled to the next eventual estate in the property from which such income was thereafter to arise ; and they would have the right to such income, while thus presumptively entitled to the capital of that part of the testator's property.

The income of $20,000 of Mrs. Thorne's fourth of the residuary estate for life, and the capital of the residue of that fourth, is given to her immediately, upon the death of the testator, through the medium of the executors ; and the trust to receive the income of the $20,000 and pay it over to her, from time to time, is a valid trust. And the limitations over of the capital of the $20,000, of that fourth of the estate of the testator, in the different contingencies contemplated by him in his will and codicil, are all valid. The dispositions made by the will, of the principal and income of the $20,000 of Mary Corse's one-fourth of the testator's residuary estate, are valid, for the same reason.

The surplus of the shares of Mary Corse and Israel Corse junior, beyond the $20,000 carved out of each share, is to be paid and delivered to them respectively when they shall arrive at the age of twenty-one. These are immediate gifts of the property. And there is an implied trust, for the executors and guardians to accumulate the income, during the minorities of the legatees respectively, for their use and benefit ; beyond the portion of such income which the executors and testamentary guardians shall think proper to apply for the support and education of these minors, in the meantime. And as these accumulations are for the benefit of infants who were in esse when such accumulations were directed to commence, and must terminate with the minorities of the respective legatees, they are valid. All the testator's interest in those portions of the property are effectually disposed of by his will, whether the minors do or do not attain the age of twenty-one.

The only interest, therefore, which Barney Corse had in the estate of his father, at the time of the filing of the bill in this cause, must depend upon a remote contingency ; and can only vest in him or his assigns, as an interest in possession, by the death of all his children during his life. For the contingent interest which was given to him by the original will, as one of

the surviving heirs of the testator, in the $20,000 carved out of each of the shares of his brother and sisters, in case such brother and sisters, or either of them, should die without leaving issue, is, by the codicil, given to his children, if he shall have any living when the event happens. But if the event contemplated by the original will of the testator, viz. the death of either of the sisters, or the brother of Barney Corse, without leaving issue, should happen during the life of Barney, and after the death of all his children, he would be entitled to some interest in the capital of $20,000 of the share of the brother or sister dying without issue. And that contingent interest, if it is of any value, may now be reached by this creditor's bill, and sold for the benefit of the complainants, if they are in a situation to prosecute a creditor's suit against him.

It is true, as I have before observed, the testator by the codicil declares that it is his will and intention that his son Barney shall not, in any event, become entitled to any part of his estate; and he therefore revokes the contingent limitation over to those who should then be his heirs, so far as Barney is concerned. But the original will directed the capital of the $20,000, in the event contemplated, to be divided among those who should be the testator's heirs at the happening of the contingency; and in the proportions in which they would take his real estate if he had died seised thereof at that time. And the share which Barney Corse would have been entitled to under the original will, is only disposed of by the codicil in case he has children living at the time of the death of the brother or sister without issue. Barney, therefore, in the events I am now contemplating, would still be entitled to an interest in the portion of the capital of the $20,000, not effectually disposed of by the will. And he would take his interest in that portion of the capital, not under the will of the testator, but as one of his original heirs at law and next of kin of the testator at the time of his death. For it is not sufficient, to deprive an heir at law or distributee of what comes to him by operation of law, as property not effectually disposed of by will, that the testator should have signified his intention, by his will, that his heir or distributee should not in-

herit any part of his estate. But to deprive an heir or distri-butee, of his share of the property which the law gives him, in case of intestacy, the testator must make a valid and effectual disposition thereof to some other person. (*Denn* v. *Gaskin*, *Cowp. Rep.* 657.)

In relation to the fourth of the estate which is given to the executors, for the use of Barney Corse's family during his life, and to his children and issue after his death, it is effectually disposed of by the will after his death, even if he should die without issue. For in that event it is to go to the then heirs of the testator, under the provision of the original will on that subject; and in the proportions which they would take in the testator's real estate if he had died at that time. So that if all the descendants of the testator should be dead, his collateral heirs then in existence would take the property, under the will. And those who were presumptively entitled to this ultimate remainder in fee, would, under the provisions of the revised statutes, have a right to the income of that fourth of the estate, if the issue of Barney Corse should become extinct before the time appointed by the will for the ultimate remainder in fee to vest in possession. But there may be some contingent interests in the income of the other shares, in the event of the death of all the issue of Barney Corse in his lifetime, in which he will be entitled to share; as interests in the testator's property not effectually disposed of by the will.

It is evident, however, that these interests of Barney Corse, in the estate of his father, and to which he may be entitled upon the happening of the contemplated event, are so very remote as not to be worth the extra costs and expenses of a chancery suit to reach them by a creditor's bill. But as they are probably worth something, the demurrer of the executors cannot be allowed upon the ground that the judgment debtor had no interest whatever, in the estate of their testator, at the time of the filing of the original or the supplemental bill in this cause. I shall therefore proceed to consider the question whether the complainants have deprived themselves of the right to further prosecute their creditor's bill against Barney Corse, and against

his estate acquired subsequent to the decree in bankruptcy, by coming in and proving their judgments, as debts, under the proceedings in bankruptcy.

Under the English bankrupt laws, the assignment gives to the assignees not only the property which the bankrupt has at the time of the assignment, but also all that he shall afterwards acquire or become possessed of, by devise, descent, bequest, or otherwise, before he shall have obtained his certificate. (*Stat.* 6 *Geo.* 4, *ch.* 16, §§ 63, 64.) An uncertificated bankrupt, under the English law, is therefore incapable of trading or contracting for his own benefit; and all the property which he at any time acquires belongs to the assignee, for the benefit of the creditors who come in and prove their debts under the proceedings in bankruptcy. (*Martin* v. *O'Hara, Cowp. Rep.* 824. *Evans* v. *Mann, Idem,* 569. *Ex parte Proudfoot,* 1 *Atk.* 252.) It is therefore of very little use for a creditor, in England, to proceed against the uncertificated bankrupt, in an ordinary suit, where he has a right to come in and prove his debt under the commission. Previous to the statute 49 Geo. 3, ch. 121, § 14, there was no positive rule of law prohibiting a creditor of the bankrupt, who had proved his debt for a special purpose, and without intending to claim a dividend of the estate, from proceeding by suit against the bankrupt to compel payment of the debt which had thus been proved. Thus, in *Ex parte Salkeld,* (1 *P. Wms. Rep.* 561,) which came before Lord Mansfield in 1719, a creditor who had come in and proved his debt to prevent the bankrupt's discharge, where he thought it necessary to do so for that purpose, was permitted to imprison the fraudulent bankrupt, upon waiving all claim to his estate under the commission. And in *Ex parte Capot,* (*West's Ch. Rep.* 633,) which was before Lord Hardwick about twenty years afterwards, his lordship allowed a creditor, who had not only proved his debt but had received two dividends thereon, to proceed against the bankrupt at law; upon restoring the dividends, and electing to relinquish all claim to his estate under the commission. He also allowed the creditor, who elected to relinquish all claim to the bankrupt's estate, to prove his debt for the purpose of assenting to or dissent

ing from the granting of a certificate. But the chancellor, in, the exercise of the summary power which he had over suitors, previous to any statutory provision on the subject, would compel a creditor, who came in and proved a debt for the purpose of getting the benefit of the proceedings under the commission, to elect between that and other remedies for the recovery of his debt. And this principle, of holding parties to their election, was subsequently followed by the court of common pleas, in the exercise of its summary jurisdiction for the relief of the bankrupt's bail; although there was then no statute in force making the proof of a debt, under the commission in bankruptcy, a conclusive election not to proceed at law; so as to make such proof of the debt a bar to a suit therefor. (*See Aylett* v. *Harford*, 2 *W. Black. Rep.* 1317.) The court of king's bench, however, in the case of *Oliver* v. *Ames*, (8 *T. R.* 364,) refused to discharge a bankrupt out of custody, upon common bail, although the plaintiff had proved his debt under a commission of bankruptcy against the defendant, and had received a dividend thereon. But that court enlarged the rule upon the sheriff, to bring in the body of the defendant, in order to enable the latter to apply to the lord chancellor for summary relief.

· This principle of holding the creditor, who had come in and obtained a dividend under the commission, to his election, protected the bankrupt from proceedings at law against him, even if he had not obtained his certificate. For all his future acquisitions being liable to be seized by his assignees, the lord chancellor held that the two remedies of the creditor were inconsistent with each other; and that the creditor could not claim under the commission, and at the same time resort to a different remedy for the recovery of his debt. The great seal therefore, in the exersise of its jurisdiction in bankruptcy, compelled the creditor to abide by his election in such a case; although the proof of the debt under the commission was not a bar at law. But the statute 5 *Geo.* 2, *ch.* 30, § 9, declared that if a second commission issued against a bankrupt, who had previously been discharged, the certificate under the second commission should exempt his person from arrest and imprisonment, but that his

Haxtun v. Corse.

future estate and effects should remain liable to his creditors. The question therefore arose, whether a bankrupt who had been discharged the second time, but whose estate did not yield fifteen shillings in the pound, could be sued at law to recover satisfaction out of his subsequent acquisitions; or whether such acquisitions belonged to the assignees in bankruptcy, under the second commission, for the payment of the debts of the creditors who had come in and proved under such second commission. This question was presented directly to the court of king's bench, for the first time, in 1793, in the case of *Philpott* v. *Corden*, (5 *T. R.* 287,) and that court decided that the proper way to reach the future acquisitions of the bankrupt was by an action at law; although it was not directly decided, in that case, that the assignee under the second commission had no interest in the effects of the bankrupt which were acquired after the allowance of his certificate. But in *Hovil* v. *Browning*, (7 *East's Rep.* 159,) which came before the same court thirteen years afterwards, it was expressly decided that the future acquisitions of the bankrupt vested in the assignees under a third commission; the creditors under the second commission not having in the meantime reached them by execution.

Such was the state of the law in England when the statute, 49 *Geo.* 3, c. 121, was passed. The 14th section of that statute declared that the proving of a debt under a commission against the bankrupt, should be deemed an election by the creditor to take the benefit of such commission with respect to the debt so proved. But the statute made no provision for vesting in the assignees, under a second commission, the estate which the bankrupt might acquire subsequent to the allowance of his second certificate. The question then arose, whether the act was a bar to an action by the creditor who had come in and proved his debt, under a second commission which had not produced 15 *s.* in the pound. This question first came before the court of king's bench, about five years after the passage of that act, in the case of *Read* v. *Sowerby*, (3 *Maule & Selw. Rep.* 78.) And that court decided that the 14th section of the statute referred to was a bar to an action for the debt;

---

Haxtun *v.* Corse.

---

and that the creditor had no other remedy, for the recovery of his claim, than that which the proof of the debt under the commission gave him. The same question came before Lord Eldon, the next year, in *Ex parte Hodgkinson*, (2 *Rose's B. Rep.* 172.) And his lordship decided that the acquisitions of the bankrupt, after the granting of his certificate under the second commission, did not vest in the assignees, although the bankrupt's estate was insufficient to pay 15 *s.* in the pound; that each creditor might bring an action for the purpose of reaching such subsequently acquired property; and that if the bankrupt pleaded his certificate, the creditor might reply that it was a certificate under a second commission and 15 *s.* in the pound had not been paid. (*See* 19 *Ves.* 293, *S. C.*) The question again came before Sir John Leach, as vice chancellor, in 1821, in *Ex parte Buckle*, (1 *Glyn & Jam. Rep.* 33,) and his honor held that the 14th section of the statute 49 *Geo.* 3, *ch.* 121, only meant that the fact of proving the debt should be a conclusive election to proceed under the commission; and that it did not touch the ultimate remedies given to creditors who fully adopted the commission. He also held that as the bankrupt's estate did not pay 15 *s.* in the pound, a creditor who had proved his debt under a second commission, might proceed by action against the bankrupt, for the purpose of charging the subsequently acquired estate. (*See also Butler* v. *Hobson*, 7 *Dowl. Pr. Ca.* 163.)

The question thus in conflict between the two courts was obviated by the statute, 6 *Geo.* 4, *c.* 16; which repealed all the previous laws on the subject of bankruptcies; and consolidated most of their provisions in a new act. That act, in addition to the provisions giving to the assignees of an uncertificated bankrupt all his future acquisitions, until his creditors who came in and proved their debts under the commission were fully satisfied, gives to the assignees under a second commission, which does not produce 15 *s.* in the pound, the future acquisitions of the bankrupt, for the benefit of the creditors who have proved their debts. And it gives to the bankrupt the right to plead his certificate in bar; without reference to the question

whether it was granted under a first or a second commission. (*See Stat.* 6 *Geo.* 4, *c.* 16, §§ 63, 64, 126, 127.) It also re-enacts the provision of the 14th section of the statute 49 *Geo.* 3, prohibiting a creditor who has instituted any suit against the bankrupt for a debt provable under the commission, from proving such debt, or having any claim entered upon the proceedings in bankruptcy, without relinquishing such suit; and declares that the proving or claiming a debt under the commission, by any creditor, shall be deemed an election by the creditor to take the benefit of such commission in respect to the debt so proved or claimed. (*Idem,* § 59.) It has been held, however, notwithstanding this provision, that the proof of one separate and independent debt under the commission, did not deprive the creditor of an uncertificated bankrupt of the right to bring a suit for another debt which had not been claimed or proved under such commission. (*Harley* v. *Greenwood,* 5 *Barn. & Ald.* 95.) In the case last referred to, the court of king's bench also decided that proof of the same debt under a commission, could not be pleaded as a *bar* to an action to recover the debt against an uncertificated bankrupt; and that the fact that the plaintiff had proved his debt under the commission, only furnished ground for an application to the court in which the suit was pending, to stay the proceeding; or for an application to the great seal to expunge the proof of the debt.

The fifth section of our bankrupt act of 1841, appears to have been framed with a view to obviate some of the difficulties which had arisen under the English bankrupt laws. For, instead of prohibiting a creditor from coming in and proving a debt, under the proceedings in bankruptcy, until he should have relinquished any suit which he had previously instituted for the recovery of that debt, as he is bound to do in England, this section of our act, of 1841, declares that the mere act of proving a debt under the proceedings in bankruptcy, shall of itself be deemed a surrender of all proceedings already commenced, and of all unsatisfied judgments already obtained on such debt. And, instead of declaring the proof of the debt to be an election by the creditor to take the benefit of the pro-

ceedings in bankruptcy in respect to such debt, our statute declares that "no creditor, or other person, coming in and proving his debt or other claim, shall be allowed to maintain any suit in law or equity therefor; but shall be deemed thereby to have waived all right of action and suit against such bankrupt." (*Owen on Bank. App.* 55.) The general result of these provisions would have been the same as those of the English bankrupt act, for which they were a substitute, if our statute had contained the other provisions of that act in relation to the future acquisitions of the bankrupt; where he does not succeed in obtaining his discharge, or where his property under a second commission does not produce 15 *s.* in the pound of the debts proved and allowed. The third section of the bankrupt act of 1841 merely declares that all the property and rights of property of a bankrupt, who shall be declared such by a decree of the court, shall by mere operation of law, *ipso facto, from the time of such decree,* be deemed to be divested out of him and vested in the assignee appointed by the court. Under this section, the late Judge Story, in *Ex parte Newhall,* (2 *Story's Rep.* 363,) decided, and I think correctly, that the future acquisitions of the bankrupt, subsequent to the decree, belonged to the bankrupt and not to his assignee. He there says: "The English statutes of bankruptcy go further, and vest in the assignee all the property of the bankrupt which comes to him by descent, distribution, or otherwise, before the discharge is obtained. But this doctrine stands only upon the positive language of those statutes, and not upon any general principles of law applicable to the subject." And Chief Justice Shaw, in the case of *Fisher* v. *Currier,* (7 *Metc. Rep.* 427,) says: "We take it to be settled that the property of a bankrupt which passes to his assignee, is all the real and personal property and all the rights of property vested in him at the time of the decree declaring him a bankrupt; and that after-acquired property does not go to the assignee." This was said in reference to the rights of a bankrupt whose discharge had been refused by the proper tribunal; which was the case then under consideration.

Haxtun v. Corse.

One of the questions presented in the present case then, is, whether a creditor who comes in and proves his debt, for the purpose of opposing the discharge of the bankrupt, because he supposes it is absolutely necessary to prove his debt to authorize him to make such opposition, is thereby absolutely barred from all claim against the property which his debtor acquires subsequent to the decree in bankruptcy; although such creditor succeeds in establishing the fact that the proceedings of the bankrupt were fraudulent, and the discharge is refused on that ground? The complainants undoubtedly supposed it was necessary to prove their debts, to enable them to oppose the discharge, as they have averred in their bill. For the court before which the proceedings in bankruptcy of their debtor were pending, had decided, in the matter of *Brown King's* bankruptcy (5 *Law Reporter*, 320,) that creditors, as such, could not file objections and contest the right of the bankrupt to a discharge without first proving their debts. I am inclined to think, however, this was an erroneous construction of the statute; and that the framers of the law intended to give all persons interested in opposing the bankrupt's discharge, as well as the creditors who had proved their debts against him, the privilege of appearing and contesting his right to such a discharge. Indeed, if the counsel for the respondent is right in supposing that the proof of a debt, under the proceedings in bankruptcy, is an absolute bar to all claims upon the future acquisitions of the bankrupt, even when the discharge is denied, those who have not proved their debts are the only class of creditors who have any interest in opposing the bankrupt's discharge. For, in that case, it must be a matter of entire indifference to those creditors who have proved their debts, whether the discharge is or is not granted; as their rights would be precisely the same in either event. And it would be absurd to suppose that the framers of the act had made this provision, authorizing the creditors who had proved their debts specially, and all *other* persons in interest generally, to come in and oppose the discharge, if, by another provision of the same statute, the mere fact of having proved their debts was to deprive them of all claim upon the

Haxtun *v.* Corse.

person or future acquisitions of the bankrupt, even if their op-position to the discharge was successful. I conclude, therefore, notwithstanding the general language contained in the fifth section of the act—that the creditors who come in and prove their debts shall not be allowed to maintain any suit at law or in equity therefor—the lawmakers did not intend that the proving of debts, by creditors, should be an absolute abandon-ment of all claim against the future acquisitions of their debtor, if his discharge was refused, or if it was void for any of the frauds specified in the act; but merely that the proving of debts, under the decree, should be considered as a waiver of the right of the creditors to institute any suits or proceedings, at law or in equity, which were in any way inconsistent with the election of such creditors to obtain satisfaction of their debts out of property of the bankrupt under the decree; and as a consent to be bound by the discharge, in case the bankrupt should obtain one .which was not impeachable for fraud or wil-ful concealment of his property.

This construction of the bankrupt act, would of course pro-tect the bankrupt from any proceedings against him, at law or in equity, until it should be finally settled that he was not entitled to a discharge. In case a discharge was granted, it would likewise protect him against the claims of fiduciary cred-itors, who had come in and proved their debts under the decree in bankruptcy; as the supreme court of the United States de-cided in the case of *Chapman* v. *Forsyth*, (2 *How. U. S. Rep.* 202.) And it would probably prevent foreign creditors, who had come in and proved their debts under the proceedings in bankruptcy, from instituting suits in another country, against a discharged bankrupt, if his discharge was not fraudulently obtained. For even foreign tribunals might consider such a waiver of all right of action and suit, either at law or in equity, by the creditors who had come in and taken their chances for a dividend of the estate of the discharged bankrupt, to be bind-ing upon such creditors there, as well as here ; although the discharge, itself, without such a waiver, might have no binding force beyond the limits of the United States. This rational

Haxtun *v.* Corse.

construction, which I am disposed to put upon this provision of the statute, would not, however, deprive creditors who had come in and proved their debts, but who had successfully resisted the fraudulent bankrupt's discharge, of all claim to his future acquisitions. Nor would it deprive them of the right, which is given under the fourth section of the act, to impeach the discharge, for fraud or wilful concealment of property, in case such fraud should be discovered after the discharge had been obtained; where they had not litigated the question of fraud upon the proceedings in bankruptcy, so as to be estopped, by the decision of the court or jury, from setting up the same matter again. And it would give full effect to the 12th section of the bankrupt act, relative to the payment of seventy-five per cent upon debts proved under a second decree in bankruptcy; so as not to bar the creditors of all right to future acquisitions, where such creditors had come in and proved their debts for the purpose of showing that the bankrupt's assets were not sufficient to pay 15s. in the pound.

I am not aware that this question has before arisen and been directly decided in this country; though several judges, when speaking in reference to suits by creditors, while the proceedings in bankruptcy were pending, and before a final decision of the court denying the bankrupt's application for a discharge, have said that a creditor who had come in and proved his debt could not sue the bankrupt. And the conclusion to which I have arrived has not been come to without considerable hesitation. But my opinion is founded upon the fact, that to give the construction to the general language of the fifth section of the bankrupt act which is contended for by the counsel for the respondents, would be to make that provision of the statute wholly inconsistent with the evident intention of the lawmakers; as evinced by several other provisions of the same act.

This, however, does not dispose of the case now before me, in favor of the appellants. For, upon another ground, I think the supplemental bill cannot be sustained. The original bill of the complainants was founded upon a judgment recovered previous to the decree in bankruptcy; and it was filed before they

Haxtun v. Corse.

came in and proved their debts under the decree And when those debts were proved, the proceedings in bankruptcy were still pending. It could not be known, therefore, when the complainants came in and proved their debts, that the discharge of the bankrupt would be denied. And it was utterly inconsistent with the evident intent and meaning of the fifth section of the bankrupt act, that the complainants should retain the lien they had acquired upon the property of the bankrupt, by the filing of their creditor's bill, so as to enable them to prosecute that suit to effect if the discharge should be subsequently denied. The statute does not merely suspend suits in the situation in which they are at the time the creditors come in and prove their debts. But all proceedings which have been commenced before that time are absolutely relinquished, surrendered, and discontinued; by the mere act of proving the debt for the recovery of which such proceedings were instituted. In the case of *Everett* v. *Derby*, (5 *Law Reporter*, 225,) before the district court of the United States for the state of Maine, Judge Ware says, " where a suit has been commenced, for the recovery of the debt, before the proof is made under the decree in bankruptcy, the proving of the debt operates as a surrender, *ipso jure*, of the action; and is a bar to any further proceedings in that suit."

In this case, the suit upon the original bill of the complainants, by the proof of their debts under the decree in bankruptcy, had been surrendered and discontinued, at the time the plea of the defendant Barney Corse was put in. Instead of pleading the proof of the debts in bar, therefore, he should have applied to the vice chancellor to dissolve the injunction and to stay all further proceedings in the suit; upon the ground that such suit was discontinued, as to him, by operation of law. And the complainants should not have taken issue upon a plea which was undoubtedly true, at the time it was pleaded, and when the replication thereto was filed; but they should have applied to have the plea taken off the files, and to have the suit dismissed upon the records of the court, without costs as to the bankrupt. And as they had, by their own act, rendered it im-

possible to proceed any farther in the suit as to the other defendants therein, they should immediately, upon proving their debts under the decree in bankruptcy, have dismissed their bill as to them.

The decree of the vice chancellor allowing the demurrers, and dismissing the supplemental bill as to the respondents, must therefore be affirmed with costs.